JABAR, J.,
dissenting.
[¶ 17] I respectfully dissent because I believe the record compels a contrary conclusion. The evidence presented before the hearing officer does not support his decision in this case, and therefore I would vacate.
[¶-18] -The hearing officer was required to determine whether the medical evidence supported Jalbert’s application for disability -retirement benefits. See 5 M.R.S., § 17106-A (2016). This undertaking is highly, dependent upon the testimony of expert witnesses, and we have held that it is the province of the fact-finder, in this instance the hearing officer, to determine what weight is to be given to this testimony. See Handrahan v. Malenko, 2011 ME 15, ¶ 14, 12 A.3d 79 (“A court is not required to believe the testimony of any particular witness, expert or otherwise, even when the witness’s testimony is uncontradicted.”) (citations omitted) (quotation marks omitted)). However, “uncon-tradicted testimony is not to be utterly disregarded and arbitrarily ignored without reason.” Thompson v. Johnson, 270 A.2d 879, 881 (Me. 1970) (quotation marks omitted). When reviewing administrative actions, we defer to the agency’s factual findings, but we do not act as a rubber stamp. See Imagineering, Inc. v. Superintendent of Ins., 593 A.2d 1050, 1053 (Me. 1991). To the contrary, we serve an appellate function, and when the evidence does not support the agency’s decision we are obligated to vacate; otherwise we should simply eliminate appellate review of agency actions. See id-, 5 M.R.S. §§ 11001, 11008 (2016); Merrill v. Me. Pub. Emps. Ret. Sys., 2014 ME 100, ¶ 13, 98 A.3d 211.
[¶ 19] The record shows that the hearing officer “disregarded and arbitrarily ignored” overwhelming and uncontradicted medical expert testimony. The hearing officer, .acting as a fact-finder, was free to disregard evidence presented by Jalbert. However, where numerous medical experts unanimously concurred that she is disabled and suffers functional limitations on ac *947 count of that disability, and the System did not present any expert testimony to refute this evidence,[7] disregarding these opinions was arbitrary.
[¶ 20] Specifically, Jalbert presented the testimony of her primary care physician, a neurologist, an ophthalmologist, and several psychologists, all of whom opined that she was disabled and that the functional limitations associated with her disability made it impossible for her to work as an elementary school teacher.
I. JALBERT’S EVIDENCE
[¶ 21] Jalbert was employed as a teacher at Dike-Newall Elementary School in Bath for twenty-four years. She received numerous positive evaluations and enjoyed an excellent reputation among staff and parents. In October 2004, she applied for disability retirement benefits for bipolar disorder, depression, and anxiety. In March 2005, she withdrew that application and continued teaching. After resuming her teaching duties, she treated with psychiatrist Lawrence Fischman, M.D., for her depression and anxiety.
[¶ 22] In late January and early February 2012, Jalbert sustained head injuries after suffering two falls withip a short period of time. As a result of these injuries, she took medical leave, was out of work for the remainder of the 2011-12 school year, and received workers’ compensation benefits for post-concussion syndrome. Upon her return to teaching that summer, she worked a modified, “light-duty” schedule aimed at accommodating her needs in light of her injuries. Her return was short-lived, however, after school officials determined at the beginning of the 2012-13 school year that this modified arrangement was not feasible. On February 21, 2013, Jalbert again applied for disability retirement benefits. Because she had not yet attained the age of sixty, she could only receive retirement benefits by establishing the existence of a disability and functional limitations. See 5 M.R.S. § 17904 (2016).
[¶ 23] As part of her application for benefits, Jalbert submitted numerous records from her treating physicians, along with deposition testimony from Dr. John Taylor. Jalbert and a co-worker also testified before the hearing officer. The numerous medical records and deposition testimony contain five separate medical opinions unanimously agreeing that Jalbert has permanent functional limitations making her return to the classroom impossible.
[¶ 24] Carl Demars, M.D., was Jalbert’s primary care physician and treated her for the injuries she sustained in the falls. He opined that Jalbert exhibited functional limitations and that she was unable “to return to her prior occupation as a teacher due to her concussion.” Dr. Demars also referred her to Dr. Taylor for a neurological assessment.
[¶25] John Taylor, D.O., a neurologist, treated Jalbert for eighteen months, and opined that it was “impossible [for] her to perform [her] duties as a school teacher.” He reiterated this opinion in a letter dated January 24, 2014, and in his deposition testimony. He indicated that she had problems with cognition and “other features associated with post-concussive syndrome.” He added that symptoms related to Jalbert’s pre-existing diagnoses of pre-morbid anxiety and depression have “also *948 been exacerbated and add to her overall functional disability.”
[¶26] Philip Morse, Ph.D., a neuropsy-chologist, also examined and treated Jal-bert. He saw her on four separate occasions and conducted numerous tests on her. He opined that it was “impossible for her to perform her duties as a school teacher,” and that in his “neuropsychological opinion it is more likely than not that her incapacity is permanent.”
[¶27] David Lilly, Psy.D., a psychologist, examined Jalbert upon a referral from Maureen Halmo, Ph.D., Jalbert’s treating psychologist. Dr. Lilly treated Jalbert for her anxiety and problems adapting to her functional limitations and deficits outlined in Dr. Morse’s neuropsy-chological evaluation. His findings were consistent with Dr. Morse’s description of her impairment on attentional tasks. Dr. Lilly concurred with Dr. Morse and the other providers regarding the existence of her disability and the functional limitations associated with it.
[¶ 28] Colin Robinson, O.D., an ophthalmologist, treated Jalbert for vision and balance issues that she experienced as a result of her head injuries. He opined that the two conditions he diagnosed her with— post-trauma vision syndrome and visual midline shift syndrome — made it impossible for her to perform her duties as a school teacher, and that it is more likely than not that her disability is permanent.
[¶ 29] All of the professionals listed above concluded that Jalbert was not able to return to the classroom. These opinions were based on Jalbert’s subjective complaints, her physical examinations, and objective tests performed by her doctors over the course of her treatment. These opinions also reveal that her cognitive, speech, vision, and psychological problems were interrelated and contributed to her disability. The only evidence produced to refute these opinions were reports submitted by the medical board, which contained a number of conclusions that were not supported by the evidence.
II. MEDICAL BOARD REPORTS
[¶ 30] The medical board reports relied upon by the hearing officer here consist of a report dated June 20, 2013, and one dated May 22, 2014. The 2013 report was part of Joint Exhibit 1 and was entered in evidence without objection. The 2014 report, however, was produced after the hearing and was never offered in evidence but was provided to the hearing officer. Notwithstanding this anomaly, which allowed the hearing officer to consider the 2014 report even though it was produced after the close of evidence, for the purposes of this dissent, I agree with the Court that the 2014 report may also be considered as evidence on appeal.[8]
*949 [¶ 31] The 2013 and 2014 medical board reports consist of fewer than ten pages altogether. The reports cherry-pick and selectively scrutinize individual medical record entries while making conclusions unsupported by the evidence. For instance, the 2013 report acknowledged the existence of Jalbert’s post-concussive syndrome diagnosis, but took issue with the purported absence from the record of an explanation as to why her condition had not improved. This line of inquiry is flawed. The proper focus should be on whether she was suffering from a disability causing functional limitations, and not whether there existed some explanation as to why her condition had not yet improved. See 5 M.R.S. § 17901 (2016).
[¶ 32] Similarly, the 2013 report acknowledged that Jalbert suffered from anxiety and depression. The board noted, however, that “[t]he records document that there are no functional limitations from anxiety and depression that would impair work function as of April 10, 2013.” Again, without any explanation, the report concluded that, notwithstanding the opinions offered by Jalbert’s medical providers— including that of Dr. Taylor which noted that her pre-existing anxiety and depression “exacerbated and add to her overall functional disability” — she didn’t have any functional limitations stemming from these diagnoses. Also without explanation, the report indicated that “[t]here is evidence in the records to suggest that psychiatric issues and secondary gain could be significant contributing factors to the member’s ultimate work separation.”
[¶33] The hearing officer’s reliance on the medical board’s conclusions regarding Jalbert’s motive for secondary gain was undoubtedly prejudicial. The Court states that the hearing officer “did not reference the medical board’s June 2013 reports.” Court’s Opinion ¶ 14 n.4.1 disagree. There is a direct connection between the board’s findings regarding secondary gain and the hearing officer’s decision. The hearing officer referenced and relied on these prejudicial conclusions, noting in his decision:
In light of this information, the Medical Board’s conclusion was that the records did not show clearly that [Jalbert] had any persistent disabling symptoms that could be directly ascribed to the post-concussive syndrome. On this basis, the Medical Board did not find functional limitations based on post-concussive syndrome. The Medical Board stated further that it found evidence in the records suggesting that psychiatric issues and secondary gain could have contributed significantly to [Jalbert’s] ultimate ivork separation.
(Emphasis added).
[¶ 34] The medical board’s assertion regarding Jalbert’s alleged motive for secondary gain was not supported by any medical evidence in the record. To the contrary, the only medical evidence in the record that addressed these issues was presented by Jalbert. Dr. Morse, Jalbert’s treating psychologist, noted that after conducting neuropsychological testing, Jalbert “performed well, indicating no evidence of suboptimal effort, symptom magnification or potential malingering.” Dr. Lilly agreed with Dr. Morse’s assessment in this regard, noting that he had no concerns with Jalbert’s efforts during testing and treat- *950 raent. Even the hearing officer found in his decision that the “neuropsychological testing of [Jalbert] found no evidence of suboptimal effort or malingering,” Because there was no evidence of secondary gain on the record, the hearing officer’s reference to secondary gain in his decision, which was based on the medical board’s reports, was unsupported by the evidence.
[¶ 35] A claim of secondary gain has a profound impact on any fact-finder and necessarily affects the fact-finder’s determination of credibility on any issue. See Deirdre M. Smith, Who Says You’re Disabled? The Role of Medical Evidence in the ADA Definition of Disability, 82 Tul. L. Rev. 1, 45 (2007) (“Thus, it appears that the ‘malingerer problem’ — that is, the prospect of the existence of some individuals who may falsely claim to be disabled for secondary gain — has long colored the entire category of ‘the disabled’ as a group of individuals with automatically suspect credibility.”).
[¶ 36] The hearing officer also improperly relied on the 2014 reports when he adopted the board’s opinions that discredited the testimony of Jalbert and a coworker, even though the medical board did not hear the testimony of these witnesses. In the 2014 report, the medical board wrote that, despite Jalbert’s subjective complaints and corroborating history from a close friend, the board did “not believe that this represents unbiased, objective information regarding her difficulties.” Referencing this statement from the medical board report, the hearing officer stated in his decision:
In its evaluation of the evidence, the Medical Board specifically critiqued the adequacy of the foundation for the opinions of Dr. Morse and Dr. DeMars in the complaints of [Jalbert] rendered to them by her and her friend ... and rejected those opinions on the basis of subjectivity and bias.
[¶ 37] The board’s conclusions discrediting Jalbert’s witnesses is an improper credibility determination made by a body that neither observed nor heard this testimony. Again, there is a direct connection between the medical board’s reports and the hearing officer’s findings, and again the board’s assertions were not supported by the evidence.
[¶ 38] Another assertion contained in the 2014 medical board report completely discredits the opinion of Dr. Robinson, an ophthalmologist. After evaluating Jalbert, Dr. Robinson made two diagnoses — post-trauma vision syndrome and visual midline shift syndrome — and opined that these diagnoses “would make it impossible [for] her to perform her duties as a school teacher.” In its 2014 report, the medical board critiqued Dr. Robinson’s diagnoses, opining that
it is the understanding of the Medical Board that these purported conditions are neither scientifically validated nor generally accepted as definable medical diagnoses by the ophthalmologic community at large.
[¶ 39] There is absolutely no evidence in the record to support this conclusion. Furthermore, there is no ophthalmologist on the medical board. Although the hearing officer discussed Dr. Robinson’s diagnoses and opinions in his decision, he did not address Dr. Robinson’s opinion that these diagnoses and the functional limitations resulting therefrom, standing alone, make it impossible for her to continue teaching. The Court’s opinion also does not address this issue, or explain how Dr. Robinson’s unrefuted opinion does not support Jal-bert’s claims for disability retirement benefits.
*951 III. CONCLUSION
[¶ 40] In conclusion, it is fundamentally unfair for an applicant for disability retirement benefits to have her medical evidence refuted by the unsupported assertions and conclusions contained in medical board reports.
[¶ 41] In this case, as a part of an adjudicatory hearing held pursuant to the Maine Administrative Procedures Act, the System did not present any medical expert witness opinions to refute the numerous medical opinions presented by Jalbert. Selectively scrutinizing and cherry-picking individual entries in voluminous medical records and making unsupported conclusions should not overcome the unrefuted medical opinions of five experts who treated Jalbert for years. Despite a clear unanimity among Jalbert’s treating physicians, who all opined that she was unable to return to a classroom of young children and fulfill her duties as a teacher, the hearing officer relied on a few pages of reports submitted by a medical board that neither examined nor treated Jalbert.
[¶ 42] Thus, I believe that the evidence presented here compels a contrary conclusion to that reached by the hearing officer, and therefore I would vacate.

. The medical board has the authority to request that a claimant undergo a medical evaluation. See 5 M.R.S. § 17106(3)(B) (2016). The MPERS Executive Director also has the authority to request medical examinations. See 5 M.R.S. §§ 17921(1)(D), 17926 (2016). MPERS therefore had numerous opportunities to obtain and introduce independent expert testimony regarding Jalbert’s medical condition.

. Citing Kelley v. Me. Pub. Emps. Ret. Sys., 2009 ME 27, 967 A.2d 676, and Anderson v. Me. Pub. Emps. Ret. Sys., 2009 ME 134, 985 A.2d 501, the hearing officer concluded that he could consider the medical board reports as evidence. Neither Kelley nor Anderson held that these reports were evidence; rather, they narrowly decided that under the statute then in effect, the hearing officer could consider the reports, as advised, without the right of the applicant to cross-examine their authors. Anderson, 2009 ME 134, ¶ 26, 985 A.2d 501; Kelley, 2009 ME 27, ¶ 25, 967 A.2d at 684.
I believe that the plain language of 5 M.R.S. § 17106(4) (2016) as amended, which became effective after we decided Anderson and Kelley, specifically provides that the medical board's reports are evidence. The Legislature amended this section by adding a provision that designates the medical board’s analysis as "evidence.” See P.L. 2009, ch. 322 § 6 (effective Sept. 12, 2009) (codified at 5 M.R.S. § 17106(4) (2016)). Following the amendment’s clear designation of the medical board reports as evidence, these reports may now be subject to cross-examination to comply with *949 the mandates of the Maine Administrative Procedures Act. See 5 M.R.S. § 9057(3), (5) (2016). Because our holdings in Anderson and Kelley did not interpret the current, amended statute, we should clarify at this time that, because the amended statute provides that the reports are to be considered evidence, the reports may be subject to cross-examination as required by the Maine Administrative Procedures Act. See id. In this case, Jalbert did not request the opportunity to cross-exam any members of the medical board.